# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:06-00148 |
| v. | ) | JUDGE ECHOLS |
| | ) | |
| JAMES THOMAS | ) | |

## MEMORANDUM

Pending before the Court is Defendant James Thomas' Motion to Suppress Evidence (Docket Entry No. 18), to which the Government responded in opposition. The Court held a suppression hearing on April 24, 2007, and the parties submitted post-hearing supplemental briefs. In support of its supplemental brief, the Government presented new evidence, prompting Defendant James Thomas' Motion to Strike Extrinsic Evidence (Docket Entry No. 34), to which the Government has not responded in opposition.

## I. FINDINGS OF FACT

Special Agent John B. Hardcastle has been a criminal investigator with the U.S. Drug Enforcement Administration ("DEA") for twenty years and is presently assigned to the downtown Nashville DEA office. He has been involved in approximately 200 narcotics investigations, including twenty-five indoor marijuana growing operations. He currently specializes in investigations into indoor marijuana growing operations and diversions of legitimate pharmaceuticals to street sales. SA Hardcastle has been involved in at least 100 search warrant executions and has written 30 to 40 search warrant applications.

SA Hardcastle testified that he provided the information for the Search Warrant and the Affidavit in Support of Search Warrant ("the affidavit") at issue in this case. (Gov't Ex. 1.) He denied making any intentional or reckless misrepresentations which appeared in the affidavit. While

SA Hardcastle testified on direct examination that he presented the affidavit and search warrant to a Davidson County criminal judge on the morning of October 25, 2005 (Suppression Hr'g Tr. at 14), he clarified on cross-examination that the search warrant affiant who actually obtained the search warrant was Tennessee Bureau of Investigation ("TBI") Special Agent Dennis Mabry (id. at 22), who did not testify at the suppression hearing.

SA Hardcastle received information from a confidential informant ("CI") that Defendant James Thomas was cultivating hybrid marijuana indoors at his home on Taz Hyde Road in Nashville and selling it. Hybrid marijuana can be grown hydroponically, and marijuana purchasers are willing to pay a higher price for the bud of the plant because it produces a greater "high" due to its increased level of tetrahydrocannabinol ("THC"), the psychoactive agent in marijuana.

Concerning the information received from the CI, the affidavit stated:

1. SA John Hardcastle with the Drug Enforcement Administration (DEA) recently met with a Confidential Informant (CI) who works for DEA. This CI provided information regarding illegal indoor marijuana grow operation located at 3971 Taz Hyde Road, Nashville, TN. This CI has worked with SA Hardcastle, and has given him reliable information within the past year. Information provided by this CI has led to the successful arrests and prosecution of three subjects who were arrested. Two were charged and convicted in Federal Court.

2. The CI has informed SA Hardcastle that James I. THOMAS has had a reputation within the marijuana community of Nashville for the past two to three years as being a successful producer of just not leaf marijuana, but the more sought after "bud" of the plant, which is more expensive and produces a greater high for the user. Typically one ounce of the "hydroponically" produced marijuana bud will sell [for as] high as $250.00 per ounce.

* * *

4. According to the reliable CI, he/she has been to the residence on at least three occasions and observed THOMAS conduct narcotic transactions. The CI has observed THOMAS exit the residence with marijuana and sell the marijuana to customers on at least three occasions.

2

(Gov't Ex. 1, Aff. ¶¶ 1-2, 4.)

SA Hardcastle arrested the CI, a marijuana cultivator, in February 2005. The CI then began cooperating with SA Hardcastle and the Metropolitan Nashville Police Department ("Metro"). Although the affidavit did not say so, the CI worked in two previous joint drug investigations. One investigation resulted in Metro's arrest of a major street distributor of hydrocodone in Nashville.[1] That case then developed into a much larger hydrocodone diversion case involving a pharmacy technician who worked at the Tullahoma Regional Medical Center.

According to SA Hardcastle, the CI was "steeped" in the marijuana growing community and told him that Defendant Thomas had a reputation in the marijuana community for cultivating good bud marijuana. The CI went to Defendant's home and was physically present inside the fence on Defendant's property when Defendant sold hybrid marijuana bud to other individuals. The CI was unable to provide any information about persons who lived at the property, but he reported that Defendant Thomas had a girlfriend.

SA Hardcastle admitted during his testimony that the affidavit did not reveal specifics about the CI's cooperation with law enforcement, including whether he worked on drug investigations. Further, the affidavit did not explain the basis for the CI's opinion concerning Defendant's reputation as a marijuana cultivator, and it did not specify when the CI witnessed Defendant's marijuana sales or whether Defendant sold hydroponically-produced marijuana. The affidavit did not say, nor was any evidence introduced at the suppression hearing, concerning whether the CI ever saw Defendant's marijuana growing operation.

---

[1]The CS had a hydrocodone addiction and sold marijuana to pay for his drug of choice.

3

All three marijuana sales made by the Defendant and witnessed by the CI preceded the CI's own arrest in February 2005. The affidavit failed to state that at least eight months had passed since the CI last witnessed the Defendant making a marijuana sale at his home. However, the CI, before his arrest, "hung out" with Defendant and others within the marijuana community. Even though the CI had been arrested eight months earlier, he was still friends with other marijuana producers. SA Hardcastle instructed the CI to seek out these other marijuana producers to obtain information about Defendant Thomas. The CI learned that the Defendant was still engaged in a marijuana growing operation. SA Hardcastle considered the information about Defendant's operation to be reliable because it "was still being renewed by this credible, reliable CS." (Suppression Hr'g Tr. at 47.) The affidavit did not contain any of this information.

The CI accompanied a Metro police officer to Defendant Thomas' residence and pointed out the residence to the officer. The officer then provided the property address, 3971 Taz Hyde Road, to SA Hardcastle, who began working on the case. The search warrant and the affidavit described the residence as "a single family residence, constructed in early 1990's, with a metal roof and frame siding. The front of the property is surrounded by wooded (sic) fence with a double gate at the beginning of the driveway. There is a black mailbox that has the numerical '3971' clearly marked in white numbers." (Gov't Ex. 1, Search Warrant at 1, Affidavit at 1.)

SA Hardcastle investigated Defendant's background. Defendant's driver's license listed his residence as 3971 Taz Hyde Road and also reflected that Defendant possessed a current handgun carry permit. Employment records did not reveal any earned income of the Defendant in the State of Tennessee for the previous two years. SA Hardcastle obtained a photograph of the Defendant and showed it to the CI, who confirmed that the photograph depicted Defendant Thomas. The search

4

warrant affidavit included the information about Defendant's address and handgun carry permit, but did not mention that the CI confirmed Defendant Thomas was depicted in a photograph or that Defendant was unemployed.

SA Hardcastle checked Metro property records. He learned that the property at 3971 Taz Hyde Road is owned by Sandra Brumit. Because he could not determine if she was a family member, he assumed she might be Defendant's girlfriend and the search warrant affidavit stated as such. In fact, Ms. Brumit is Defendant's mother. According to SA Hardcastle, Metro property records indicated there were a main home and two outbuildings located at 3971 Taz Hyde Road. The main home is 1059 square feet in size. The property records did not provide additional information about the outbuildings or note that there is an above-ground pool on the property.

The affidavit stated that "[o]n 10-18-2005 at approximately 10:15 a.m, SA Hardcastle drove by the residence of 3971 Taz Hyde Road and observed THOMAS standing in the driveway smoking a cigarette." (Gov't Ex. 1, Aff. ¶ 3.) SA Hardcastle testified that he drove out to the location to inspect it, but because the property is situated in a highly secluded area and any type of traffic would draw attention, he did not drive any closer than approximately 200 feet from the property. From there he could see the hydraulic gate at the entrance to the property, the main dwelling, and an outbuilding that appeared to be a one-and-one-half story barn. SA Hardcastle further testified that, from his position on Taz Hyde Road, he could not see a house trailer located behind the house.

The Court finds that SA Hardcastle could not have stopped his vehicle 200 feet from the property and still have been able to see the gate, the main dwelling, and the barn-like structure. If SA Hardcastle were positioned on Taz Hyde Road facing 3971 as shown in photograph number 1 of Defendant's Collective Exhibit 2, it is highly doubtful that he would have been able to see the

5

barn-like building sitting to the left of the main dwelling because that outbuilding was obscured by tree limbs. Moving closer, as shown in photograph number 2, he might have discerned the roof line of the barn-like structure. At either position as shown in photographs 1 and 2, SA Hardcastle would also have been able to see some type of structure located behind the main dwelling, but he would not have been able to tell with certainty that the structure was a trailer which served as a separate residence.

The affidavit states that SA Hardcastle "drove by" the property. In order to do so, he would have been required to drive past 3971 Taz Hyde Road, take a sharp curve and drive downhill to the dead-end of the road near the neighbor's house. Even finding that SA Hardcastle drove by the property, past the hydraulic gate and mailbox and down the hill to the neighbor's house (photograph 10) where he could turn around and look up (photograph 9), SA Hardcastle would have been able to see the main dwelling, the barn-like structure and another structure behind the main dwelling, but he would not have been able to tell whether the building behind the main dwelling was a trailer or some other type of outbuilding. The Court finds that a reasonable law enforcement officer looking at the property from any of these vantage points could conclude that the structure at the rear of the property was an outbuilding.

Based on his experience that outbuildings ordinarily are not heated and cooled, SA Hardcastle contacted Nashville Electric Service ("NES") orally by telephone to obtain the electric usage records for 3971 Taz Hyde Road from March to September 2005. In doing so the Court finds that SA Hardcastle understood that he was obtaining electric usage records for the main home with 1059 square feet of space. The monthly electric bills ranged from $300 to $500 per month, which SA Hardcastle believed to be high for a dwelling this size. The NES representative volunteered to

6

SA Hardcastle that the bill for January 2005 at 3971 Taz Hyde Road was $745 and that the bill had been paid without complaint by the customer, even though such an electric bill would ordinarily be incurred only by a large business or an industrial facility. SA Hardcastle relied on this information because NES had given reliable monthly usage information for other properties in the past.

SA Hardcastle also obtained electric usage records for a newer 1568-square-foot home located nearby at 3986 Taz Hyde Road. Although the house at 3986 Taz Hyde Road was approximately 400 square feet larger than the main house at 3971 Taz Hyde Road, the electric bills for 3986 were one-third to one-half lower than those at 3971 for each month during the same time period. This comparative electric usage information for the two properties was included in the search warrant affidavit.

While SA Hardcastle agreed during his testimony that a number of variables would affect a monthly electric bill, he did not believe the variables would be so great as to account for a nearly triple increase in electric usage at 3971 Taz Hyde Road, despite the age[2] and poor condition of the main dwelling at that location. SA Hardcastle agreed that electric usage data alone cannot provide probable cause to support a search warrant.

The NES representative who provided electric usage information to SA Hardcastle did not tell him that NES sent Sandra Brumit a letter in January 2002 alleging that her property was in violation of codes because "[a]fter inspection it was found the house meter service[] supplies another residence [the trailer] in addition to the main house." (Def. Ex. 1.) The NES letter informed

---

[2]The affidavit reported the main home at 3971 Taz Hyde Road was built in the "early 1990's, with a metal roof and frame siding." (Gov't Ex. 1, Aff. at 1.) The testimony revealed that the house was actually built around 1900. This discrepancy between 1990 and 1900 could have been a simple typographical error, and Defendant presented no evidence that SA Hardcastle or SA Mabry intentionally or recklessly misrepresented the date in the search warrant affidavit.

7

Ms. Brumit that "the trailer in question must have its own and separate meter service center[,]" and gave her ten days to correct the problem. In SA Hardcastle's experience, NES provides information to law enforcement only about electric usage and any complaints made by the customer, and NES does not specify the number or type of buildings which exist on a property.

SA Mabry obtained the search warrant at 11:45 a.m., on October 25, 2005. Among those officers who executed the search warrant on October 26, 2005, were SA Hardcastle and ATF Agent Dan Emmerich. The electronic hydraulic gate at the front of the property could not be opened manually or with a set of bolt cutters. The gate was pushed open by a Metro vehicle. The front of the property was fenced in and there were several dogs on the property. It did not appear that anyone was at the main residence. To the left of the main house was the barn-type building with a room on the second floor and a small window unit air conditioner that was not operating. It did not appear that anyone was living there. The agents swept the building and garage and did not find any occupants. At that point agents saw the house trailer located a short distance behind the main house. (Def. Collective Ex. 2, Photograph 7.) Other officers went to the trailer and discovered Defendant Thomas inside the trailer. He was taken into custody and handcuffed as a protective measure. Officers swept the trailer to make sure there were no other occupants, especially armed occupants. When the officers emerged from the trailer, they stated there was a marijuana growing operation inside.

SA Hardcastle estimated the size of the trailer to be six or seven hundred square feet. The marijuana growing operation was in two parts. The first part was in one of the closets in the main bedroom at the right of the trailer which contained lighting equipment for mature adult marijuana plants. The second part was the "clone room," where clippings were taken from the adult female

8

plant to grow mature adult marijuana bud-producing plants. Defendant was using one bedroom as a harvesting room and both of his children slept in a third bedroom.

SA Hardcastle gave Defendant his <u>Miranda</u> warnings in the presence of ATF Agent Emmerich. In response to questions, Defendant stated that he obtained 40 marijuana seeds from Marc Emery through an advertisement in a magazine called *Cannabis Culture*, which caters to marijuana cultivators.[3] Defendant also stated that he obtained his equipment locally, he taught himself to grow marijuana by reading publications, and he started the growing operation two years earlier.

During the search officers seized, among other things, marijuana plants with root systems, small seeding plants, one large female marijuana plant, one small female marijuana plant, handguns, processed marijuana buds, and growing equipment, including various lights and an electric exhaust fan to remove heat from the trailer which was generated by grow lights. SA Hardcastle testified that the above-ground pool contained dingy water, like pond water, about halfway down, and neither the pump nor the heater were operating.

Sandra Brumit testified that the property at 3971 Taz Hyde Road had been in her family for over one hundred years and that she had lived in the main house for thirty years. Other than the main house there is a garage (the barn-like structure) and a trailer on the property. She testified that all of these buildings are heated and cooled. On the day of the search a total of six people were living on the property. She and another son lived in the main house; her son, Defendant Thomas, his girlfriend and their two children lived in the trailer. She explained that the main home is very

---

[3]According to SA Hardcastle, Marc Emery is a Canadian national currently under indictment in the United States.

old and is not well insulated. It is heated by a wood stove and numerous space heaters. In the summer it is cooled by window air conditioners. She testified her home requires a substantial amount of electricity for heating and cooling. None of the buildings are heated by gas. Ms. Brumit further testified that the trailer has been on the property approximately nine years and it has central heating and air conditioning.

Ms. Brumit presented the series of eleven photographs showing the view of her property at various points as the property is approached from the front. (Def. Collective Ex. 2.) Photograph Numbers 1 through 3, as well as 9 and 10, were discussed above. Photograph Numbers 4 through 8 show the position of the main house and the barn-like garage (Nos. 4-5), the location of the electric meter (No. 6), the trailer at the back of the property (No. 7) and the above-ground pool to the left of the barn-like garage (No. 8.) The residence at 3986 Taz Hyde Road, for which SA Hardcastle obtained comparative electric usage information, is located across the road from Ms. Brumit's property. (Photograph Number 11.) The mailbox for that home can be seen in photograph numbers 1-3. The residence at 3986 Taz Hyde Road is more modern and is heated with propane gas. Ms. Brumit's niece, Sherry Williams, along with her husband and two children live in that home. Ms. Brumit testified she visits them once every six months.

NES sends one bill for electric service for the entire property at 3971 Taz Hyde Road. There is one electric meter that serves the main house and the trailer. In 2002 NES sent Ms. Brumit a letter concerning the fact that both residences were hooked up to the same electric meter, (Def. Ex. 1), but Ms. Brumit testified the letter was incorrect because an electrician had connected both residences to one meter. She did not explain if or how NES' concern was resolved.

10

Ms. Brumit further testified that Defendant and his girlfriend have been paying the electricity bill since the trailer was moved onto the property nine years ago, and she does not see the bill. Previously, when she, her younger son and her ex-husband were living in the main house and using space heaters the NES bill ran approximately $300 per month in the winter. She did not know how the unemployed Defendant paid the electric bill so long as the bill was paid. She stated that Defendant's girlfriend worked and managed money well, but she knew that the electric bill was paid late and extensions for payment were sought. According to Ms. Brumit, the pool was used between April and mid-September 2005 and the pump "goes 24/7," using electricity, but she did not think the pool was heated.

Ms. Brumit denied any knowledge that her son was growing marijuana in the trailer, and stated she did not become aware of it until the search warrant was executed. She testified that she had never been inside her son's house trailer located directly behind her house for the entire nine years he lived there, even though the trailer was supplied electricity from her electric meter. She denied that she had ever visited her son, his girlfriend, or her two grandsons who live in the trailer, which she estimated sits only about thirty feet behind her house.[4] She testified that she has knocked on the door of the trailer, but she has never stepped inside. The Court finds this testimony is not credible. The Court does not believe that Ms. Brumit could live within thirty feet of her son and her two elementary school-age grandchildren and not ever enter the trailer to visit them. Ms. Brumit's lack of credibility on this point causes the Court to also doubt the veracity of her testimony

---

[4]The Court is aware from the evidence presented at the detention hearing that Defendant's sons at that time were 9 and 11 years of age. (Docket Entry No. 19, Order at 5.)

concerning the usage and cost of electricity at 3971 Taz Hyde Road and whether she knew her son was growing marijuana.

Defendant called as an expert witness David Thomas, a licensed professional engineer and electrical contractor in Tennessee for twenty-seven years. He is not related to Defendant Thomas. Mr. Thomas has no experience with marijuana growing operations. Mr. Thomas reviewed the search warrant affidavit which included the electric usage data for 3971 and 3986 Taz Hyde Road. He also visually inspected the two properties from the road and from the inside in March 2007. He did not have square footage information for the properties, although he was told by the occupant (presumably Defendant or his girlfriend) that the trailer at 3971 Taz Hyde Road was 16 x 80 feet, or 1280 square feet. Based on his visual inspection from the road he could draw no conclusion about the disparity in the electric bills for the two properties. From his experience he surmised that the higher bills for 3971 Taz Hyde Road might be because there are two residences on that property.

To further evaluate the disparity in the bills for the properties at 3971 and 3986 Taz Hyde Road, Mr. Thomas would have to identify and catalog all electrical consumption equipment within the two dwelling units, obtain the load information about the electricity those appliances and other equipment consume, and try to make an assessment about how that load was distributed on those electrical services. He would also have to know how many kilowatt hours each appliance was used by the consumer. Mr. Thomas did not undertake this investigation, however, and gave no testimony concerning such an examination. The Court gives little weight to Mr. Thomas' testimony because it did not provide the Court with any technical or scientific basis upon which to hold that the higher electrical usage at 3971 as compared to 3986 was directly and solely due to the electrical usage needs of two households at 3971, as opposed to Defendant's marijuana growing operation.

12

At the conclusion of the suppression hearing, the Court found that Defendant had not carried his burden to make a substantial preliminary showing that SA Hardcastle or SA Mabry knowingly and intentionally or with reckless disregard for the truth made one or more false statements necessary to the finding of probable cause, in order to satisfy the requirements for a hearing under Franks v. Delaware, 438 U.S. 154 (1978). Defendant Thomas now asks the Court to reconsider that ruling.

The Court has not considered any of the new electrical usage information provided by the Government with its Supplemental Response to Defendant's Suppression Motion (Docket Entry No. 33, 33-1 & 33-2), including the chart and argument contained on pages 2 through 4 of the Supplemental Response. This evidence and argument could have been presented at the suppression hearing, and because it was not, Defendant Thomas has had no opportunity to cross-examine the evidence or respond to the argument. Defendant Thomas' Motion to Strike Extrinsic Evidence (Docket Entry No. 34) will be GRANTED.

## II. STANDARD OF REVIEW

In order for a judicial officer to issue a search warrant, law enforcement officials must present evidence from which the magistrate can conclude from the totality of the circumstances, "including the 'veracity' and 'basis' of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). An issuing judge's discretion should only be reversed if it was arbitrarily exercised; reviewing courts are to accord the judge's determination "great deference." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (citing Gates). "[L]ine-by-line scrutiny [of an underlying affidavit is] . . . inappropriate in reviewing [a judge's]

decisions." <u>Gates</u>, 462 U.S. at 246 n.14. "[S]o long as the [judge] had a `substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." <u>Id.</u> at 236 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)). The critical question is whether the information in the affidavit, when presented to the state court criminal judge, established that there was a fair probability that illegal drugs would be found at 3971 Taz Hyde Road.

### III.  ANALYSIS

#### A. Franks hearing

Defendant first challenges the search warrant on the ground that it contains false allegations or statements intentionally or recklessly made by the affiant which should be excised. The Court is required to hold a <u>Franks</u> hearing if a defendant makes a substantial preliminary showing that a false statement necessary to the finding of probable cause was made knowingly and intentionally or with reckless disregard for the truth and was included by the affiant in a search warrant affidavit. <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). In accordance with the ruling made from the bench and upon reconsideration, the Court determines that Defendant Thomas has not carried his burden to make the substantial preliminary showing to justify a <u>Franks</u> hearing.

At the suppression hearing SA Hardcastle expressly denied that he knowingly and intentionally or with reckless disregard for the truth made any false statement that was included in the search warrant affidavit. Defendant did not make the necessary substantial preliminary showing through the testimony of Ms. Brumit and Mr. Thomas. As explained above, the Court does not find Ms. Brumit's testimony to be credible. Further, even though the main dwelling at 3971 Taz Hyde Road was built around 1900 as compared to the newer home at 3986 Taz Hyde Road, Mr. Thomas'

14

testimony was of very limited assistance to the Court and the Court has given that testimony little weight. It was immaterial to the probable cause analysis whether Sandra Brumit was Defendant's mother or girlfriend. Defendant produced his own affidavit concerning misrepresentations he believes were included in the search warrant affidavit (Docket Entry No. 18-2), all of which the Court has addressed, yet Defendant did not testify and subject himself to cross-examination by the Government. Further, Defendant did not subpoena SA Mabry as a witness to show that SA Mabry knowingly and intentionally or with reckless disregard for the truth included false statements in the affidavit.

The Court finds that Defendant Thomas did not make the required substantial preliminary showing that either SA Hardcastle or Agent Mabry made any false statement in the search warrant affidavit that was necessary to the finding of probable cause. Therefore, a <u>Franks</u> hearing was not required and the Court reaffirms its earlier ruling stated from the bench at the conclusion of the suppression hearing.

**B. Probable cause**

Defendant challenges the search warrant on the ground that the information provided by the CI was stale and too vague to support a finding of probable cause. The information procured from the CI and included in the search warrant affidavit was not stale, nor was it too vague.

Whether information is stale is to be determined by the circumstances of the particular case. <u>United States v. Spikes</u>, 158 F.3d 913, 923 (6th Cir. 1998) (citing <u>Sgro v. United States</u>, 287 U.S. 206, 210-211 (1932)). "In judging the 'circumstances of each case,' the length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." <u>Id.</u> The question of staleness depends on the "inherent nature of the crime." <u>United</u>

States v. Henson, 848 F.2d 1374, 1382 (6th Cir. 1988). "Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: 'the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc.'" Spikes, 158 F.3d at 923 (quoted case omitted). Even if a significant period of time has elapsed since the last reported criminal activity of a defendant, "it is still possible that, depending upon the nature of the crime, a [judge] may properly infer that evidence of wrongdoing is still to be found on the premises." Id.; United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) (holding information was not stale even though informant revealed that he had remodeled defendant's second floor two years earlier to allow defendant to grow marijuana indoors because information showed an ongoing criminal business of a necessarily long-term nature). The passage of time becomes less significant the more protracted the criminal activity is and the more continuous in nature it is. Spikes, 158 F.3d at 924 (citing United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972)). The court asked to issue a search warrant may properly infer that equipment acquired to grow marijuana and records of criminal activity will be kept for some period of time. United States v. Canan, 48 F.3d 954, 959 (6th Cir. 1995); Greany, 929 F.3d at 525. Because marijuana growing is necessarily long-term in nature, "greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time." Greany, 929 F.3d at 525; United States v. Thomas, 9 F.3d 110, 1993 WL 337553 at *5 (6th Cir. 1993) (unpublished) ("A marijuana growing operation, in which marijuana must grow to maturity and then be harvested, has

16

a longer lifetime of relevant data than a cocaine distribution operation in which all sales may be consummated within hours of delivery.")

In Spikes, 158 F.3d at 924, the Sixth Circuit held that information obtained over a four-year period concerning a crack cocaine manufacturing and trafficking operation was not stale because a continuing series of incidents occurred and were linked to the same address. See also United States v. Hammond, 351 F.3d 765, 771 (6th Cir. 2003) (holding informant's tip about marijuana growing operation that was five months old was not stale in part because drugs were likely to be there for an indefinite period of time and the place to be searched constituted a secure operational base); United States v. Word, 806 F.2d 658, 662 (6th Cir. 1986) (finding probable cause where affidavit referring to doctor's sale of drugs over period of four months was not stale because crime was of continuing nature).  Here, the CI informed SA Hardcastle that he had been present on Defendant Thomas' property and watched as Defendant Thomas "exit[ed] the residence with marijuana and [sold] the marijuana to customers on at least three occasions."  (Aff. ¶ 4.)  The CI in this case had been an indoor marijuana grower himself; he was accepted in these circles, and he continued to talk to the indoor growers.  He believed Defendant Thomas was growing marijuana at the time the search warrant was executed.  The search warrant affidavit presented by SA Mabry did not reveal when these sales occurred, but even if the affidavit had stated that the information was at least eight months old because the conduct occurred before the CI's own arrest, the judge could still have found the information was not too stale under the cases cited above.

Moreover, the search warrant affidavit contained additional corroborating information in the form of the electric usage information from March to September 2005 just prior to issuance of the search warrant on October 25, 2005.  The high electric bills associated with the 3971 Taz Hyde Road

location, which in the view of experienced law enforcement officers was consistent with an ongoing marijuana growing operation, refreshed and corroborated the information given by the CI that Defendant Thomas had a reputation in the marijuana growing community for producing bud marijuana and that Defendant made sales of marijuana on the property on at least three occasions. See Spikes, 158 F.3d at 924 (citing Henson for proposition that where more recent information corroborates otherwise stale information, probable cause may be found). It is true that the state judge was not told via the search warrant affidavit that there were two residences using electricity at 3971 Taz Hyde Road. But SA Hardcastle did not know that there were two residences on the property either. The Court is required to evaluate as a whole the totality of the circumstances available to the officers and the judge. Gates, 462 U.S. at 238. Thus, even assuming the CI's information about marijuana sales was somewhat stale, the more recent electric usage information viewed in conjunction with the CI's information provided the basis for a finding of probable cause sufficient to support the search warrant. See United States v. Zimmer, 14 F.3d 286, 287-289 (6th Cir. 1994) (holding in marijuana growing case that electric records showing home used substantially more electricity than other neighborhood homes helped form basis of probable cause); Thomas, 1993 WL 337553 at *5 (observing that with "a proven, reliable CI, warrants can properly issue on very little additional information[,]" and noting that electric usage records, among other evidence, sufficiently corroborated anonymous tipster's letters to justify issuance of search warrant).

Contrary to Defendant's position, the affidavit in this case was not too vague. "The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." United States v. Allen, 211 F.3d 970, 975 (6th Cir. 2000) (en banc). Although the affidavit in this case did not explain the nature of the CI's participation in prior

18

criminal investigations with SA Hardcastle and SA Mabry, the state judge was apprized of information explaining why the CI was considered to be reliable. First, the affidavit included extensive information about SA Mabry's training and experience in drug cases and identified SA Hardcastle as an agent of the DEA. Second, the affidavit stated: "This CI has worked with SA Hardcastle, and has given him reliable information within the past year. Information provided by this CI has led to the successful arrests and prosecution of three subjects who were arrested. Two were charged and convicted in Federal Court." (Aff. ¶ 1.) In considering a similar recitation in a search warrant affidavit, the Allen court wrote:

> It is obvious on the face of the affidavit that such information in the past most likely concerned narcotics. Affidavits are not required to use magic words, nor does what is obvious in context need to be spelled out; if a CI saw guns, he is not required to explain how he knew what a gun looks like. Nor is an affidavit required to present proof that would without question withstand rigorous cross-examination. Clearly, this CI's past experience with the drug trade was reflected anew in the circumstances of this case. Taken as a whole, the affidavit provided sufficient facts from which the magistrate could draw an independent conclusion as to the probability (certainty is *not* required) of what it alleged a search would disclose. There was nothing arbitrary about a conclusion that, in this case, probable cause existed.

Id. As in Allen, the CI involved here was not anonymous, but personally known to SA Hardcastle, the CI worked with SA Hardcastle and other officers over a period of months, and "the information alleged [by the CI] was of direct observation of criminal activity." Id. at 976. In such a case, the *en banc* Sixth Circuit ruled,

> Corroboration is not a necessity . . . . A requirement that information from such a CI should invariably have to be personally corroborated by further police investigation would aid lawbreakers, as detectives tried to conduct surveillance in crack-ridden neighborhoods without themselves being detected and their suspects alerted. Moreover, the additional time thus added to the process by mandating an independent police investigation following a CI's contact would provide a further advantage to drug dealers' already highly mobile, hit-and-run operations. We decline to handicap the state in that way.

19

Id. SA Hardcastle corroborated information the CI gave him which could be easily corroborated. See id.

The Court is not required to undertake a line-by-line analysis of the affidavit and the Court must look at the totality of the circumstances in deciding whether the affidavit was sufficient to establish probable cause. See Gates, 462 U.S. at 238. Viewing the affidavit in a commonsense manner, the Court concludes that in the totality of the circumstances there was a fair probability that a marijuana growing operation would be found at 3971 Taz Hyde Road.

**C. Good faith exception**

Even assuming the search warrant was deficient in some way, the Court finds the good faith exception to the warrant requirement as established in United States v. Leon, 468 U.S. 897 (1984), would apply. The inquiry from Leon is "whether a reasonably trained police officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n.23.

Here, the Court determines law enforcement officers "acted in objective good faith" when they relied on the search warrant. Id. at 908. SA Mabry presented a neutral judicial officer with an affidavit stating that he was aware of information indicating the presence of a marijuana growing operation at a specific location based on the report of a reliable informant that was corroborated by electric usage records and other details about the Defendant. See United States v. Jarrell, 68 Fed.Appx. 622, (6th Cir. 2003) (applying Leon good faith exception to uphold search based on warrant pertaining to marijuana growing operation corroborated in part by electric usage records). The Court finds the affidavit at issue was not "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975)). Officers acted in good faith in executing the search warrant.

20

## IV.  CONCLUSION

For all of the reasons stated, Defendant James Thomas' Motion to Strike Extrinsic Evidence (Docket Entry No. 34) will be GRANTED, but his Motion to Suppress Evidence (Docket Entry No. 18) will be DENIED.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

21